USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-9-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
FERNANDO MALDONADO,

                            Plaintiff,

        -against-

GOOD DAY APARTMENTS, INC.

                          Defendant.
-----------------------------------------------------------------x

12 Civ. 2017 (PKC) (AJP)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge:

        Plaintiff Fernando Maldonado, proceeding *pro se*, brings this action against defendant Good Day Apartments, Inc. ("Good Day"), his former employer. Plaintiff filed the complaint in the Civil Court of the City of New York, Bronx County, asserting claims for "[b]reach of [c]ontract or [w]arranty;" "[f]ailure to pay for wages;" "[f]ailure to pay for services rendered;" "[r]efund on [d]efective [m]erchandise;" "[g]oods [s]old and [d]elivered;" and "[m]onies [d]ue." (Docket No. 1 Ex. A.) Defendant removed the case to this Court asserting that section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, completely preempts plaintiff's state-law claims because the terms of employment are governed by a collective bargaining agreement (the "CBA") between plaintiff's union, SEIU, Local 32BJ (the "Union"), and the Bronx Realty Advisory Board (the "BRAB"), a collective bargaining representative. Defendant now moves for summary judgment, pursuant to Rule 56, Fed. R. Civ. P., asserting that plaintiff's claims fail to comply with requirements of section 301. For the reasons stated herein, the motion is granted.

BACKGROUND

Good Day owns a residential housing complex located at 2201 Haviland Avenue, Bronx, New York (the "Building"). (Hofer Aff. ¶¶ 1, 4; Orwel Aff. Ex. G (Maldonado Dep. at 40 (07/27/2012) (hereinafter "Dep.")).) Melanie Hofer is the President of Good Day. (Hofer Aff. ¶ 2.) Richard Hofer serves as Vice President and Managing Agent. (Id. ¶ 1.)

On or about January 31, 2000, Good Day hired plaintiff to clean and maintain the Building for residents. (Orwel Aff. Ex. C; Dep. at 27, 45.) During the period of employment plaintiff lived in the Building in a rent-free basement apartment. (Hofer Aff. ¶ 5.) Throughout the course of his employment plaintiff was a member of the Union. (Dep. at 19, 27.) A CBA between the Union and the BRAB, effective March 15, 2011 through March 14, 2015, dictated the terms of plaintiff's employment. (Hofer Aff. ¶ 6; see id. Ex. A.) With the exception of certain modifications, the March 2011 CBA "renews and extends" the terms of a CBA effective between 2008 and 2011. (Id. Ex. A; see Orwel Aff. Ex. B.)

The parties dispute whether plaintiff adequately performed his duties. According to plaintiff, his work "was only poor when work requests were not within the scope of [his] job description." (Pl. Opp. at 1-2.)[1] The parties also appear to dispute whether plaintiff's job title was that of "porter" or "assistant superintendent." (Compare Dep. at 89 with Hofer Aff. ¶ 3.)

Plaintiff asserts that defendant could not get the Building's superintendent to perform his duties, and therefore defendant insisted that plaintiff perform them instead. (Pl. Opp. at 2.) Prior to his termination, plaintiff was suspended from his position at least once when, in August of 2010, Melanie Hofer asked plaintiff to clean the inside of an apartment after a tenant

---

[1] The Court deems plaintiff's November 12, 2012 letter to the Court (and accompanying exhibits) as plaintiff's opposition to the motion.

2

had moved out, and plaintiff did not. (Dep. at 84-86.) Plaintiff testified that for years he performed the task despite it being outside of his job description. The disagreement was resolved by plaintiff and defendant's representatives without the need for arbitration. (Id. at 85.) According to plaintiff, the Union representative explained to Hofer that the assigned task was not part of plaintiff's job. The Union representative advised plaintiff that in the future he should complete the task and report the incident to the Union. (Id.)

According to plaintiff, throughout the course of his employment he complained to his Union representative numerous times about "daily harassments" and "situations [he] faced regarding Defendant." (Pl. Opp. at 2.) However, he did not document the disputes and therefore the Union did not proceed to arbitration after his termination. (Id.)

On September 16, 2011, defendant terminated plaintiff's employment by letter. (Orwel Aff. Ex. D.) The letter states:

> Effective immediately, you are dismissed from your position as Assistant Superintendent of these premises.
>
> This dismissal is based on your chronic failure to do your job diligently despite repeated warnings and suspensions, which you have disregarded again. We regret having to take this action, but your repeated misconduct is not acceptable.

(Id.) The letter cites numerous reasons for plaintiff's dismissal including, *inter alia*, refusing to return employer's phone calls; not cleaning the hallways; going "off the premises whenever you feel like;" failing to submit weekly logs on-time; and leaving personal belongings in common areas of the building. (Id.) The termination letter also lists instances of prior written warnings to plaintiff and advises that the CBA required plaintiff to vacate the apartment within 30 days. (Id.)

Plaintiff challenged his termination pursuant to the CBA, which provides that the dispute "arising under this Agreement . . . must first be submitted in writing by the party

3

claiming to be aggrieved to the other party . . . ." (Orwel Aff. Ex. B. at 29.) Within 14 days, a Union representative and the employer must discuss resolution of the grievance. (Id.) If no agreement is reached, "[t]he grievance shall be scheduled for the next meeting between a representative of the BRAB and the Union." (Id. at 29-30.) If still no agreement is reached, either party may submit the grievance to a contract arbitrator within 14 days. (Id. at 30.)

In September of 2011, the Union wrote defendant advising that a dispute had arisen under the CBA regarding plaintiff's discharge and that the Union sought relief including reinstatement, back pay and lost benefits. (Pl. Ex. A.) Pursuant to the terms of the CBA, plaintiff met with representatives of the Union and Melanie Hofer. (Dep. at 49.) At some point in time after the meeting, plaintiff was presented with a stipulation of agreement, which provided that he would receive $1700 to cover the costs of window gates he had installed in the apartment. The stipulation of settlement also provided that if plaintiff vacated by November 30, 2011, he would receive an additional $1350 ($750 for moving expenses and $600 for installing floor tiles in the apartment) as well as 11 weeks of pay (ten weeks severance and one week vacation). (Pl. Ex. D.) The unsigned stipulation of settlement dated September 28, 2011 is plaintiff's Exhibit D. Plaintiff chose not to sign the stipulation and instead to pursue arbitration. (Dep. at 50-51.)

In accordance with plaintiff's decision to pursue arbitration, the Union referred plaintiff's grievance for internal review in order to determine whether it would exercise its right to arbitrate. On November 1, 2011, the Union informed plaintiff by letter that after "carefully review[ing] the facts and circumstances" surrounding the grievance, it had determined that plaintiff's grievance lacked sufficient merit and was unlikely to prevail in arbitration. (Pl. Ex. A.) Therefore, the Union concluded it was not in its interests and the interests of its membership to proceed. (Id.) The same letter instructed plaintiff to write to the Grievance Appeal Board

4

within 21 days in order to appeal this determination. A timely appeal would result in a hearing. (Id.) The Court assumes that plaintiff wrote to the Grievance Appeal Board, because the Grievance Appeal Board scheduled a hearing for February 2, 2012.[2] (Id.) On February 13, 2012, the Joint Executive Board adopted the recommendation of the Grievance Appeal Board and declined to proceed to arbitration because plaintiff's claim lacked sufficient merit. (Orwel Aff. Ex. E.) Plaintiff did not take further action within the Union to challenge this determination. (Dep. at 56.) Thus, the Union declined to proceed to arbitration on plaintiff's assertion that he was wrongfully terminated by Good Day. (Id. at 55.)

    While the Union's internal deliberation process was underway, plaintiff did not vacate the Building. The CBA provides that employees who occupy an apartment as part of their compensation must be given 30 days to vacate after receiving a notice of discharge, or in the case of a disputed discharge, 30 days from an arbitrator's award sustaining the discharge. (Orwel Aff. Ex. B at 31-32.) The CBA prohibits an employer from dispossessing an employee or his possessions, or terminating utility or phone payments, until the grievance matter is resolved. (Id. at 33.) However, employers may charge terminated employees who do not vacate by the date required and such fees may be deducted from any final compensation due. (Id. at 32.) The employee does not have a duty "to vacate his apartment unless and until the Employer deposits any monies owed with the Union." (Id.)

    Good Day instituted holdover proceedings in Bronx County Civil Court on December 2, 2011. It requested a judgment of $2,754.06 for plaintiff's use and occupancy of the premises. (Pl. Ex. B.) The parties signed a stipulation dated February 24, 2012, which provided

---

[2] At his deposition, plaintiff testified that the Union "sent [him] a letter stating they're going to take it further to arbitration at an adequacy peer board by February 2nd." (Dep. at 53.) Though the testimony appears to contradict the Union's letter, this discrepancy does not affect the Court's conclusion.

that plaintiff would vacate the premises on or before April 24, 2012. (Pl. Ex. C.) That settlement states that "[i]f [plaintiff] surrenders keys and vac[ates] on or before March 31, 2012, [Good Day] will give $500 to [plaintiff] for moving expenses." (Id.)

On April 3, 2012, Good Day notified plaintiff by letter that "per agreement with union 32BJ [his] apartment was to be broom swept and turned over to owner within 30 days of employee's termination on September 16, 2011." (Pl. Ex. C.) The letter also stated:

> The Union set a rent value of $700.00 per month on this apartment. You have incurred fees of $3850.00 for monthly rent and $1891.06 for actual utilities through March 13, 2012. This is a total of **$5,741.06 now due**.
>
> Please send payment of $5,741.06 within 10 days of date of this letter to the above address.
>
> Yours Truly,
>
> Richard N. Hofer
>
> P.S. Use and occupancy fees will continue until apartment is turned over to us.

(Id.) Plaintiff vacated the Building on April 24, 2012. (Dep. at 41.)

Plaintiff filed this suit in New York State Supreme Court on March 5, 2012. Good Day subsequently removed the case to this Court. The complaint, a one-page form document, lists six "causes of action" for breach of contract or warranty for $7,753.32 with interest from September 16, 2011; failure to pay for wages; failure to pay for services rendered; refund on defective merchandise; goods sold and delivered; and monies due. (Orwel Aff. Ex. A.) There are no other allegations. Plaintiff asserts he is owed $7,753.32, an amount based on six separate items, which plaintiff produced to defendant in the form of a checklist. (Orwel Aff. Ex. F; Dep. 16-18.) These include: (1) one week of vacation pay; (2) ten weeks paid severance;

6

(3) moving expenses; (4) reimbursement for phone charges (for July, August, and & mid-September); (5) costs for installing window gates/guards; and (6) labor costs for installing flooring. (Orwel Aff. Ex. F.) At his deposition plaintiff admitted this is the only relief sought. (Dep. at 18.) Notably, these demands are nearly identical to the terms of the stipulation of settlement plaintiff refused to sign in favor of pursuing arbitration.[3] (Pl. Ex. D; see also Pl. Opp. at 2 ("Defendant previously acknowledged everything listed on my complaint checklist as it was derived from the stipulation agreement.").) Defendant's Answer asserts that to the extent plaintiff is entitled to recover, defendant is entitled to an offset (Docket No. 8 at 2), presumably for the months plaintiff continued to live in the basement apartment without paying rent.

Good Day now moves for summary judgment pursuant to Rue 56, Fed. R. Civ. P., asserting each of these claims is completely preempted by section 301 of the LMRA, and plaintiff has failed to exhaust the grievance procedures outlined in the CBA or bring a claim against the Union for breach of its duty of fair representation.

LEGAL STANDARD

The "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute about a fact is material if it "might affect the outcome of

---

[3] According to plaintiff, he did not sign the stipulation agreement, which offered much of the relief he now seeks, because it would have waived his rights against Good Day. (Pl. Opp. at 2.) Plaintiff has filed a complaint with the New York Department of Labor claiming Good Day did not give "[him] deductions in the pay stubs." (Dep. at 15; see also Pl. Opp. at 2.) Plaintiff also testified that he went to the "National Labor Board" regarding the Union, but that "they didn't take it further" due to insufficient evidence. (Dep. at 90-91.)

7

the suit under the governing law." Id. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The moving party bears the burden of identifying matters that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A *pro se* party's submissions must be read liberally. This precept is especially strong in the summary judgment context, where claims are subject to final dismissal. Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988). "However, at some point in a lawsuit even *pro se* litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case," even where the plaintiff proceeds *pro se*. Salahuddin v. Coughlin, 781 F.2d 24, 29 (2d Cir. 1986).

ANALYSIS

1. Federal preemption of state-law claims

Good Day argues that because plaintiff's state-law claims directly arise out of or are substantially dependent upon an analysis of the CBA, they are completely preempted by section 301 of the Labor Management Relations Act.

Generally, a defendant may not remove an action to federal court on the basis that federal-law preempts a state-law claim. Domnister v. Exclusive Ambulette, Inc., 607 F.3d 84, 88 (2d Cir. 2010). "However, the Supreme Court has recognized a limited exception to this rule when Congress has so completely preempted an area of law that any civil complaint is necessarily federal in character." Id. Such "complete preemption" has been found in a limited number of circumstances, including section 301 of the LMRA. Id. at 89 n.2. "Section 301 of the

LMRA governs actions by an employee against an employer for breach of a collective bargaining agreement." Dougherty v. Am. Tel. & Tel. Co., 902 F.2d 201, 203 (2d Cir. 1990). "[W]hen a state claim alleges a violation of a labor contract, the Supreme Court has held that such claim is preempted by section 301 and must instead be resolved by reference to federal law." Vera v. Saks & Co., 335 F.3d 109, 114 (2d Cir. 2003) (per curiam).

"The ordinary [section] 301 case is a contract claim in which a party to the collective-bargaining agreement expressly asserts that a provision of the agreement has been violated." Int'l Bhd. of Elec. Workers, AFL-CIO v. Hechler, 481 U.S. 851, 857 (1987). "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987) (quoting Hechler, 481 U.S. at 859 n.3). Thus, the formulation of plaintiff's claims as based on state law is not binding "where rights and obligations under the pertinent collective bargaining agreement are inextricably involved in the underlying claim." Dougherty, 902 F.2d at 203. Still, there is an "elusive" distinction between claims that require *interpretation* of the CBA versus claims that merely require the CBA be *consulted*. Wynn v. AC Rochester, 273 F.3d 153, 158 (2d Cir. 2001) (per curiam). The latter type of state-law claim is not extinguished by federal law. Id. at 157 (holding plaintiff's fraud claim did not require interpretation of CBA and was not preempted).

District courts evaluate a defendant's right to remove a case based on the pleadings at the time the petition was filed. Vera, 335 F.3d at 116 n.2. A defendant may not justify removal based on facts not alleged in the complaint. See Caterpillar, 482 U.S. at 397. While the complaint does not mention or refer to the CBA, liberally construed, the breach of contract claim asserts that defendant acted in violation of rights conferred by his employment

9

contract, the CBA, and thus, the case was properly removed. See Beriguete v. Roosevelt Hosp. Env. Servs., 11 Civ. 3085, 2011 WL 6844529, at *2 (S.D.N.Y. Dec. 29, 2011) (Cote, J.) ("barebones state court complaint" did not explicitly reference CBA but alleged employer acted in violation of rights conferred by employment contract); cf. Domnister, 607 F.3d at 90 (concluding district court lacked removal jurisdiction based on preemption because "[a]s written, there is no suggestion in plaintiffs' state-court complaint that a CBA or any concerted protected activity will play a role in the case"). Indeed, the complaint requests interest accruing from September 16, 2011—the date of plaintiff's termination—for the breach of contract claim.

Good Day asserts plaintiff's demands for (1) vacation pay, (2) ten weeks paid severance, (3) moving expenses, and (4) reimbursement for phone charges—though not specifically mentioned in the complaint—are each founded directly on rights created by the CBA, citing Salamea v. Macy's East, Inc., 426 F. Supp. 2d 149, 155 (S.D.N.Y. 2006) (dispute regarding failure to pay accrued vacation depended on interpretation of provision in collective bargaining agreement regarding vacation time); Monumental Blunders, Inc. v. CBS Corp., 00 Civ. 220, 2000 WL 777893 (S.D.N.Y. June 15, 2000) (dispute regarding plaintiff's severance required interpretation of term in collective bargaining agreement).

The breach of contract claim, which is based on a breach of the collective bargaining agreement, is grounded in rights created by the collective bargaining agreement. At his deposition, plaintiff admitted that his first four demands were based on provisions in the Union contract.[4] (Dep. at 19, 56-60.) Plaintiff has put forth no alternative basis for his rights to

---

[4] Plaintiff's opposition indicates that the one week of paid vacation "is not part of the CBA." (Pl. Opp. at 3.) Plaintiff urges that "[d]efendant withheld my vacation week intentionally and it is rightfully owed upon termination. I could have used that to move as it would have contributed towards moving expenses, not even that would Defendant give back to me." (Id.) It may be that plaintiff understands defendant to argue that the Union and not defendant owes such funds to plaintiff. Defendant makes no such argument. In any case, plaintiff has already

10

such payments and reimbursements, and does not assert that such rights derive from state law or a statute. Article XVII of the CBA provides that "Employees shall receive vacation with payment in advance during the year" and employees "employed in the building for a period of five (5) years shall receive three (3) weeks" of vacation. (Orwel Aff. Ex. B at 24-25.) Terminated employees, who have worked in the building at least six months, are "entitled to receive a pro-rated vacation allowance . . . ." (Id.) Article X provides that "severance pay may be awarded where in the determination of the Arbitrator, the equities or best interest of the respective parties may so require . . . but shall not exceed the rate of two (2) weeks for each year of service to a maximum of ten (10) weeks." (Id. at 14.) Other provisions in the CBA state that "[a]ll post-trial employees occupying living quarters as part of or incident to their employment shall receive moving expenses within the Metropolitan Area, of Seven Hundred and Fifty ($750.00) Dollars," and that "[e]mployees who occupy premises as part of their compensation or as incident thereto shall receive, without charge, gas, electric, and telephone facilities . . . ." (Id. at 15, 19.)

Good Day also argues that plaintiff's demands for costs associated with installing (5) window guards in 2000 and (6) floor tiles in 2011 are intertwined with the CBA and require its interpretation because plaintiff obtained the apartment pursuant to his employment. In the alternative, Good Day urges that the parties had no reimbursement agreement for the fixtures and thus, plaintiff cannot establish a claim under state law. (Def. Mem. at 8-9.)

True, a plaintiff working pursuant to a CBA "is permitted to assert legal rights *independent*" of the CBA, including state-law contractual rights, "if the contract relied upon is

---

admitted that his vacation time was provided for in the CBA, and his explanation as to why the week of paid vacation is not grounded in the CBA lacks sufficient legal or factual support.

11

*not* a collective bargaining agreement." Caterpillar, 482 U.S. at 396 (emphases in original) ("[I]ndividual employment contracts are not inevitably superseded by any subsequent collective agreement covering an individual employee, and claims based upon them may arise under state law."). Defendant cites plaintiff's admission at deposition that there was no lease agreement between the parties.[5] (Dep. at 71.) Plaintiff admits that there was no written agreement regarding reimbursement for the window gates, but claims in his unsworn opposition that the parties had an "oral understanding." (Pl. Opp. at 3.) Plaintiff's testimony at his deposition reflects that Melanie Hofer permitted plaintiff to put up window guards as long as they were fire department approved. When plaintiff showed Hofer the receipt for the guards, she never got back to him, and he "left it alone." (Dep. at 63-65.) Plaintiff was asked whether he requested reimbursement and responded "No. I figured showing her the bills, she would understand that's what I meant." (Id. at 66.) Plaintiff asserts defendant acknowledged repairing the floor tiles was "undoubtedly necessary." (Pl. Opp. at 3.) Hofer provided plaintiff with several boxes of tiles. Plaintiff purchased additional tiles on his own and paid for the installation. Plaintiff testified that he spoke to Hofer about reimbursement for installing the tiles and "she didn't respond to anything." (Id. at 70-71 (Q: "You didn't have any arrangement with her that you would do the floors and she would repay you?" A: "No.").)

The CBA obligates an employer to "in compliance with the law, provide without charge, suitable and habitable living quarters designated by the Employer for the employees where such employees live on the premises." (Orwe Aff. Ex. B at 20.) Plaintiff testified that the

---

[5] Curiously, the Petition filed by defendant in the holdover proceedings in Bronx County Civil Court asserts the parties did have a lease agreement, which expired on November 30, 2011. (Pl. Ex. B.) Plaintiff's opposition to the motion asserts that in those proceedings "Defendant failed to document court papers that the apartment came with my employment and I didn't have a lease." (Pl. Opp. at 1.) In any case, plaintiff fails to proffer a lease or evidence that such lease entitled him to the claimed reimbursements.

window repairs were necessary for safety reasons (Dep. at 62), and in opposition to this motion he asserts that he "feared for the safety of [his] family and belongings being stolen if guards were not installed." (Pl. Opp. at 3.) Plaintiff claims a flood occurred which necessitated flooring repairs. (Id.) A sewer outside the apartment had been damaged and water coming into the apartment created mildew. (Dep. at 67.)

If plaintiff meant to allege that he is entitled to reimbursement for the window guards and floor tiles under the terms of the CBA, his claims are preempted because they require the Court's interpretation of the CBA.[6] If plaintiff meant to allege that he is entitled to reimbursement on an alternate basis, plaintiff has not put forth evidence of an independent agreement between the parties or some basis for relief under a state law or statute.

2.  Claims under Section 301

Defendant goes on to argue that plaintiff's claims fail under section 301 because he did not exhaust the CBA's grievance and arbitration procedures, nor did he bring a claim against the Union for breaching its duty of fair representation. The Court may dismiss the complaint "for failure to make use of the grievance procedures established in the" CBA or as "[preempted] under [section] 301." See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220-21 (1985). The Court affords plaintiff special solicitude as a *pro se* litigant but declines to consider plaintiff's claims as if he had asserted them under section 301 because plaintiff did not exhaust the CBA grievance procedures and the record before the Court does not fairly raise an issue that the Union breached its duty of fair representation. Cf. Wall v. Constr. & Gen. Laborers' Union, Local 230, 224 F.3d 168, 178-79 (2d Cir. 2000) ("We leave to the sound discretion of the district

---

[6] Good Day does not proffer a collective bargaining agreement effective when the window guards were installed in 2000.

13

court whether, on remand, to allow appellants leave to replead the claims in question as arising under federal law.").

"Since the employee's claim [under section 301] is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced." Vaca v. Sipes, 386 U.S. 171, 184 (1967); Dougherty, 902 F.2d at 203 (before filing an action under section 301 employee must exhaust CBA grievance procedures). "For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement." Vaca, 386 U.S. at 184. Still, the remedies provided for in collective bargaining agreements "have been devised and are often controlled by the union and the employer" and thus, "may well prove unsatisfactory or unworkable for the individual grievant." Id. at 185. Accordingly, in certain circumstances an "employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures." Id. Such circumstances include cases where (1) the employer's conduct amounts to "repudiation of those contractual procedures;" (2) "the union has sole power under the contract to invoke the higher stages of the grievance procedure, and . . . the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance," id.; and (3) the union member shows that arbitration would be futile. See Glover v. St. Louis-San Francisco Ry. Co., 393 U.S. 324, 331 (1969).[7] There is no evidence on the record before this Court that would permit a finding in plaintiff's favor on the first or third prongs.

---

[7] The Supreme Court announced the futility exception to the exhaustion requirement in a case involving Union representatives and employers acting in contrivance to bar certain employees from promotion "wholly because of race." Glover, 393 U.S. at 331. Subsequent to Glover, "the futility exception has been largely limited to situations where the operation of bias or prejudice renders any attempts to resort to contractual remedies useless, and does not apply to situations where the union decides not to pursue a grievance in the appropriate exercise of its discretion."

14

As to the second prong, "the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." Vaca, 386 U.S. at 186. In order to prevail, an employee suing his employer in a "hybrid" section 301 claim "must not only show that [his] discharge was contrary to the contract, but must also carry the burden of demonstrating breach of duty by the Union." Carrion v. Ent. Ass'n, Metal Trades Branch Local Union 638, 227 F.3d 29, 33 (2d Cir. 2000) (per curiam) (alteration in original) (quoting DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 165 (1983)). An employee does not have an absolute right to have his grievance taken to arbitration. Ryan v. New York Newspaper Printing Pressmen's Union No. 2, 590 F.2d 451, 455 (2d Cir. 1979). Rather, a "union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." Sanozky v. Int'l Ass'n of Machinists & Aerospace Workers, 415 F.3d 279, 282 (2d Cir. 2005) (per curiam) (internal quotation marks and citation omitted). A union's actions are arbitrary if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Id. at 282-83 (internal quotation marks and citation omitted). "A showing of '[b]ad faith requires a showing of fraudulent, deceitful, or dishonest action.'" White v. White Rose Food, a Div. of DiGiorgio Corp., 237 F.3d 174, 179 (2d Cir. 2001) (alteration in original) (quoting Sim v. N.Y. Mailers' Union No. 6, 166 F.3d 465, 472 (2d Cir. 1999)). "A union's acts

---

Vera v. Saks & Co., 424 F. Supp. 2d 694, 707 (S.D.N.Y.) (collecting cases), aff'd, 208 Fed. Appx. 66 (2d Cir. 2006).

are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" Vaughn v. Air Line Pilot Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (quoting Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge, 403 U.S. 274 (1971)).[8]

The parties did not proceed to arbitration and thus, plaintiff did not exhaust the CBA's grievance and arbitration procedures. Notably, the Union's September 2011 letter informed defendant that the Union sought reinstatement, back pay and lost benefits. (Pl. Ex. A.) Such relief is inconsistent with much of the relief sought in this action, which could only become due upon termination, e.g. severance. But even if the grievance plaintiff sought to arbitrate encompassed some or all of the above-listed claims, plaintiff did not proceed to arbitration.

Further, the record does not indicate that the Union wrongfully refused to allow the claims proceed to arbitration.[9] The complaint, a one-page form, contains no allegation that the Union breached its duty of fair representation. (Orwell Aff. Ex. A.) The record before the Court reflects that the Union reviewed plaintiff's grievance and determined it lacked sufficient merit. True, plaintiff's unsworn opposition asserts that for years he brought complaints regarding his employer's "harassments" to the attention of his Union representative, which according to plaintiff "fell on deaf ears." (Pl. Opp. at 2.) But plaintiff admits his own failure to

---

[8] If plaintiff establishes that the Union breached its duty, he must also show a causal connection between the Union's wrongful conduct and his injury. White Rose Food, 237 F.3d at 179.

[9] Defendant argues plaintiff's claims are properly dismissed because asserting a claim against the Union is a "predicate to maintaining a claim against an employer for breach of the CBA." (Def. Mem. at 10.) While plaintiff must demonstrate that the Union breached its duty of fair representation, he need not bring a claim against his Union. "The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both." White Rose Food, 237 F.3d at 179.

document these instances prevented him from moving forward to arbitration. (Id.) Plaintiff also asserts that:

> Since, Defendant could not get the Superintendent to perform his job and instead insisted I do it. She retaliated and made it her mission to fabricate lies to get me terminated so the Union would have just cause without being held responsible. Defendant consulted with Union legal counsel, Carole Keegan, to find ways to terminate me. Otherwise, Defendant wouldn't easily have been able to terminate my employment. Finally, the Union gave in to Defendant's shenanigans because of the mass of paperwork of lies she submitted.

(Id.) Such vague, unsworn assertions without more, do not reflect that the Union's decision was arbitrary, discriminatory, or in bad faith.

## CONCLUSION

Defendant's motion for summary judgment (Docket No. 19) is granted. The Clerk is directed to enter judgment for defendant. Counsel for defendant is directed to provide copies of unreported decisions to plaintiff within fourteen (14) days of this Memorandum and Order.

SO ORDERED.

                                                P. Kevin Castel
                                                United States District Judge

Dated: New York, New York
       July 9, 2013